**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

SOLUTIA, INC., *et al.,*

Reorganized Debtors.

**FOR PUBLICATION**

Chapter 11

Case No. 03-17949 (MG)

(Jointly Administered)

(Closed Cases)

**MEMORANDUM OPINION AND ORDER DENYING MOTION TO REOPEN CLOSED CHAPTER 11 CASES AND, IN THE ALTERNATIVE, TO ABSTAIN FROM DECIDING ISSUES IN FAVOR OF DECISION IN PENDING STATE COURT ACTIONS**

*A P P E A R A N C E S :*

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Paramount Global and General Electric Co.*
767 Fifth Avenue
New York, New York 10153
By:     Yehudah L. Buchweitz, Esq.
        Robert J. Lemons, Esq.
        Cameron Mae Bonk, Esq.

MCGUIREWOODS LLP
*Attorneys for Reorganized Solutia Inc.*
1251 Avenue of the Americas 20th Floor
New York, New York 10020-1104
By:     Dion W. Hayes, Esq.
        Shawn R. Fox, Esq.

845 Texas Avenue 24th Floor
Houston, Texas 77002
By:     Andrew C. Papa, Esq.

THOMPSON COBURN LLP
*Attorneys for Monsanto Company and Pharmacia, LLC*
488 Madison Avenue
New York, New York 10022
By:    Christopher M. Hohn, Esq.
        David M. Mangian, Esq.
        Mark S. Indelicato, Esq.
        Mark T. Power, Esq.

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO P.C.
*Attorneys for Kyocera AVX Components Corporation*
919 Third Avenue
New York, New York 10022
By:    LisaMarie Collins, Esq.
        Kaitlyn Crowe, Esq.

BERRY SILBERBERG STOKES PC
*Attorneys for The Gillette Company LLC*
16150 Main Circle Drive Suite 120
St. Louis, MO 63017
By:    Robert P. Berry, Esq.

PHILLIPS LYTLE LLP
*Attorneys for Magnetek, Inc.*
One Canalside
125 Main Street
Buffalo, New York 14203-2887
By:    Ryan A. Lema, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This Opinion addresses contested motions to reopen the closed chapter 11 cases of

Solutia, Inc. and its affiliates (collectively, "Solutia"), or, in the alternative, to abstain from

decision on the underlying issues in favor of pending proceedings in the Missouri Courts.[1]

---

[1]    As described in more detail below, there was an action pending in the Circuit Court of St. Louis County, Missouri (the "Missouri State Court") that was removed to the United States District Court for the Eastern District of Missouri (the "Missouri District Court," together with the Missouri State Court, the "Missouri Courts").  A motion to remand the proceeding to the Missouri State Court is pending. Thus, it is currently unclear in which Missouri court the action will proceed.

Solutia's insolvency arose from its liabilities from the manufacture and sale of polychlorinated biphenyls ("PCBs"), a class of ubiquitous chemically inert and heat-resistant chemicals that were integral to manufacturing of electrical equipment, including transformers and capacitors, and many other manufacturing uses in the United States and worldwide, for most of the 20th century.  PCBs, despite their beneficial uses, were also a scourge, leading to serious environmental contamination and health harms still being experienced today.  They are often referred to as "forever chemicals" because they are persistent in the environment and can build up in the body over time.

Manufacturing and sales of PCBs were largely phased out for most uses beginning in the early 1970s.  In 1979, the Environmental Protection Agency ("EPA") largely banned the continued manufacture of PCBs.  Not surprisingly, the use and misuse of PCBs led to lawsuits in state and federal courts across the country, many such cases continuing today, with many defendants.

Solutia and its affiliates, created in 1977 as the result of a spin-off from Monsanto Chemical Company that had long been involved in the manufacture and sale of PCBs, were the chapter 11 debtors in these now-closed cases filed in this Court on December 17, 2003 and closed on March 29, 2010, after successfully confirming a chapter 11 plan on November 29, 2007 ("Plan," ECF Doc. # 4444).  The cases were complicated, with a reorganization plan that reflected many settlements and compromises that many such complex plans entail.  From the filing of the cases in 2003 until the cases were closed in 2010, Bankruptcy Judge Prudence C. Beatty presided over the cases.

Solutia is now a wholly-owned subsidiary of Eastman Company, a New York Stock Exchange listed company.  No one has suggested that Eastman or Solutia are insolvent or in financial distress.  Eastman appears to have a market capitalization of nearly $10 billion.

The underlying issues raised by the pending motions are whether this Court or a non-bankruptcy court should decide the extent of the obligations, if any, of Solutia and the other parties to a series of written agreements.  Those agreements, referred to as special undertaking agreements ("SUAs" explained in more detail below), require the purchasers of the PCBs to indemnify the seller (Monsanto or Solutia) for all liability arising from the PCBs.  With some variation, the SUAs required the seller (Monsanto or Solutia) to cooperate in the defense of litigating any claims arising from the PCBs.

Solutia did not schedule the SUAs in its bankruptcy schedules, and it did not in express terms reserve rights to assert indemnification claims.  The Movants (as defined below) assert that the SUAs were executory contracts that were deemed rejected upon confirmation of the Solutia chapter 11 Plan.  Solutia disputes that the SUAs were executory contracts, and it also argues that it did not have to specifically reserve rights to assert indemnification claims against the SUA counterparties since it did not know of such claims at the time of confirmation.

After the motion to reopen the case was filed on May 3, 2023 ("Motion to Reopen," ECF Doc. # 4790), the closed cases were reassigned to me (ECF Doc. # 4794).  The Motion to Reopen is contested by Solutia and others, and, in addition, Solutia has filed a motion to abstain (the "Motion to Abstain," ECF Doc. # 4823) in favor of adjudication of the issues in a Missouri court.

It is undisputed that the non-bankruptcy Missouri Courts where an action is currently pending have concurrent jurisdiction with this Court over the disputed issues.  So, the issue for

4

this Court is whether to reopen the Solutia chapter 11 case and decide the issue of the

enforceability of at least some of the SUAs (there is some variation in the agreements and not all

counterparties have appeared in this Court), or whether to either deny the motion to reopen the

cases or abstain from deciding the underlying issues, leaving the issues to be decided by a non-

bankruptcy court in Missouri that has concurrent jurisdiction.

For the reasons explained below, the Court **DENIES** the Motion to Reopen, and, in the

alternative, **GRANTS** the Motion to Abstain.

## I.    BACKGROUND

Pending before the Court is the Motion to Reopen filed by  Paramount Global

("Paramount") and General Electric Company ("GE," together, the "Movants"), which seeks

entry of an order reopening the chapter 11 cases of the above-captioned reorganized debtor,

Solutia, Inc. ("Solutia" or "Debtor," and together with the other debtors, the "Debtors") pursuant

to section 350(b) of the Bankruptcy Code, Rule 5010 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and Rule 5010-1 of the Local Bankruptcy Rules for the

United States Bankruptcy Court for the Southern District of New York in order to require

compliance by Solutia with the Plan.  In support of the Motion, the Movants submit the

declarations of Robert Noethiger (the "Noethiger Declaration," ECF Doc. # 4791), Stephen

Murray (the "Murray Declaration," ECF Doc. # 4792), and Yehudah L. Buchweitz ("Buchweitz

Declaration," ECF Doc. # 4793.  Attached to the Motion to Reopen as Exhibit B is the *Motion of*

*Paramount Global And General Electric Company To Compel Compliance With The Chapter 11*

*Plan And Confirmation Order, And Enjoin Solutia From Pursuing Unpreserved Claims*

("Proposed Motion to Enforce").  These declarations and exhibits were admitted in evidence

during the August 16, 2023 hearing on the Motions.  The following parties filed Joinders to the

Motion: The Gillette Company LLC ("Gillette," and its joinder, the "Gillette Joinder," ECF Doc. # 4818), Kyocera AVX Components Corporation ("KAVX," and its joinder, the "KAVX Joinder," ECF Doc. # 4810) and Magnetek, Inc. ("Magnetek," and its joinder the "Magnetek Joinder," ECF Doc. # 4807 and Magnatek, together with Gillette and KAVX, the "SUA Parties").

Reorganized Solutia, now a wholly-owned subsidiary of the Eastman Company, filed an objection, which included a motion to abstain (the "Abstention Motion," and the "Solutia Objection," ECF Doc. # 4823). Monsanto Company ("Monsanto") and Pharmacia, LLC ("Pharmacia", and together with Monsanto, the "Monsanto Parties") joined in the objection (the "Monsanto Objection Joinder," ECF Doc. # 4826). The Movants filed a reply (the "Reply," ECF Doc. # 4833) as well as a supplemental declaration of Yehudah L. Buchweitz (the "Supplemental Buchweitz Decl," ECF Doc. # 4834). KAVX and Magnatek filed joinders to the Reply. (ECF Doc. ## 4839, 4840.) Finally, Reorganized Solutia filed a reply with respect to their abstention motion (the "Abstention Reply," ECF Doc. # 4823) which Monsanto and Pharmacia joined. (*See* ECF Doc. # 4844.)

For the reasons discussed more fully below, the Court declines to reopen the cases, and in the alternative, decides to abstain in favor of permitting the non-bankruptcy court in Missouri, that has concurrent jurisdiction, to resolve the issues. The disputes involve non-debtor parties, not all of whom are parties in this Court. This Court cannot finally resolve the issues affecting all the non-debtor parties, but the non-bankruptcy court in Missouri can do so. Judicial efficiency is better served by leaving these issues to a Missouri court.

**A. The Manufacture, Sale, and Use of PCBs**

As already stated, PCBs are a class of chemicals that were integral to the manufacturing of transformers and capacitors, among other things, in the United States for most of the 20th century. (Buchweitz Decl. Ex. 4, *Monsanto Company et al. v. Magnetek, Inc. et al.*, First Amended Petition, No. 17SLCC03368 (Cir. Ct. St. Louis Cty. Mo., Aug. 3, 2022) (the "Missouri Comp." or "Missouri Complaint") at 3.) From approximately 1935 to 1977, Pharmacia, LLC f/k/a Old Monsanto Company a/k/a Monsanto Chemical Co. ("Old Monsanto") manufactured and sold PCBs in bulk to several industrial customers—including Paramount's predecessor-in-interest, Westinghouse Electric Corporation ("Westinghouse"), GE, Magnetek's predecessor-in-interest, Universal Manufacturing Corporation ("Universal"), Kyocera AVX's predecessor-in-interest, Aerovox Corporation ("Aerovox"), and Gillette's predecessor-in-interest, P.R. Mallory & Co. Inc. ("P.R. Mallory")—who incorporated those PCBs into a variety of products and then sold those products throughout the United States. (*Id.* at 2–3, 10–11.)

In 1970, in response to growing concerns that PCBs persisted in the environment, Old Monsanto announced that it would phase-out PCBs production for all non-electrical applications. (*Id.* at 3, 12.) By 1971, Old Monsanto no longer sold PCBs for non-electrical applications. (*Id.* at 16.) However, because PCBs were the sole nonflammable, dielectric fluid available, Old Monsanto continued to manufacture and sell PCBs to customers for electrical applications. (*Id.*) To obtain PCBs from Old Monsanto from that point forward, Old Monsanto required buyers to indemnify Old Monsanto against "any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition." (*Id.*)

### B.  The Applicable Special Undertaking Agreements

On January 15, 1972, Westinghouse and Old Monsanto executed a written agreement titled "Special Undertaking by Purchasers of Polychlorinated Biphenyls," a copy of which is attached to the Noethiger Declaration as Exhibit 4 (the "Paramount SUA").[2]  Old Monsanto signed the Paramount SUA in Missouri.  (Missouri Complaint at 23; Paramount SUA at 3.)  Further, the Paramount SUA chose Missouri as its governing law.  (Paramount SUA at 3.)  On January 21, 1972, GE and Old Monsanto executed a similar written agreement titled "Special Undertaking by Purchasers of Polychlorinated Biphenyls," a copy of which is attached to the Murray Declaration as Exhibit 4 (the "GE SUA").  Old Monsanto signed the GE SUA in Missouri.  (Missouri Complaint at 20; GE SUA, at 2.)  Not all the SUAs contained choice of law provisions—Solutia contends they are all governed by Missouri law; Paramount and GE dispute this conclusion, but it is unnecessary for the Court to resolve those issues.

Westinghouse and GE did not accept the initial terms of the SUAs, and instead, contend that they negotiated to add material additional terms.  (Motion to Reopen ¶ 11.)  Westinghouse negotiated with Old Monsanto to add, among other things, a cooperation provision that required, in the event of litigation, that Old Monsanto make necessary information available to Westinghouse "and otherwise . . . cooperate fully with [Westinghouse] in connection therewith."  (*See* Noethiger Decl. Ex. 3, Draft SUA Signed by Westinghouse (Jan. 12, 1972).)  GE negotiated with Old Monsanto for the inclusion of, among other things, the addition of a side letter with the requirement that Monsanto provide timely notice of claims for indemnity to GE pursuant to its

---

[2]       Paramount is the successor-in-interest to Westinghouse.  On or about November 10, 1997, Westinghouse changed its name to CBS Corporation.  On or about May 4, 2000, CBS Corporation merged into Viacom Inc. with Viacom Inc. as the surviving corporation.  On or about January 1, 2006, Viacom Inc. spun off CBS Corporation.  In or around December 2019, Viacom Inc. and CBS Corporation merged once again, with Viacom CBS as the surviving entity.  In or around February 2022, Viacom CBS changed its name to Paramount.  (Missouri Complaint, at 7.)

SUA, as well for cooperation in defense of claims.  (*Id.*)  In January and February 1972, Old

Monsanto agreed to each of Westinghouse and GE's proposed revisions in the "Westinghouse

SUA" and "GE SUA," respectively.  (*See* Noethiger Decl. Ex. 4, Letter from E. Putzell to C.

Myers Encl. Executed Jan. 15, 1972 Westinghouse SUA (Feb. 2, 1972); Murray Decl. Ex. 3,

Executed GE SUA and Side Letter (Jan. 21, 1972).)

On January 7, 1972, Universal and Old Monsanto executed a similar written agreement

titled "Special Undertaking by Purchasers of Polychlorinated Biphenyls," a copy of which is

attached to the Missouri Complaint as Exhibit 1 (the "Magnetek SUA").[3]  Old Monsanto signed

the Magnetek SUA in Missouri.  (Missouri Complaint at 17; Magnetek SUA at 1.)

On February 7, 1972, Aerovox, Aerovox Canada Limited, and Old Monsanto executed a

similar written agreement titled "Special Undertaking by Purchasers of Polychlorinated

Biphenyls," a copy of which is attached to the Missouri Complaint as Exhibit 4 (the "Kyocera

SUA").[4]  Old Monsanto signed the Kyocera SUA in Missouri.  (Missouri Complaint at 25;

Kyocera SUA at 2.)

On March 20, 1972, Aerovox, Aerovox Canada Limited ("Aerovox Canada"), Old

Monsanto, and Monsanto Canada Limited executed a similar written agreement titled "Special

Undertaking by Purchasers of Polychlorinated Biphenyls," a copy of which is attached to the

Missouri Complaint as Exhibit 4 (the "Canadian Kyocera SUA," and together with the Kyocera

---

[3]    Magnetek is the successor-in-interest to Universal.  Universal merged into Magnetek on or about July 11,
1986, with Magnetek as the surviving corporation.  (Missouri Complaint, at 7.)

[4]    Kyocera AVX is the successor in interest to Aerovox.  On June 4, 1973, Aerovox merged with AVX
Ceramics Corporation ("AVX Ceramics"), with AVX Ceramics as the surviving entity.  On December 31, 1973,
AVX Ceramics changed its name to AVX Corporation.  On January 18, 1990 AVX Corporation merged into KC
Subsidiary Corporation with KC Subsidiary Corporation as the surviving corporation. KC Subsidiary Corporation
then changed its name to AVX Corporation ("AVX").  On or about March 30, 2020, Kyocera Corporation acquired
AVX through a second-step merger of a wholly owned subsidiary of Kyocera Corporation with and into AVX. As a
result of the merger, AVX became a wholly-owned subsidiary of Kyocera Corporation.  On October 1, 2021, AVX
changed its corporate name to Kyocera AVX.  (Missouri Complaint at 8.)

SUA, the "Kyocera SUAs").  Old Monsanto signed the Canadian Kyocera SUA in Missouri.

(Missouri Complaint at 25; Canadian Kyocera SUA at 2.)

On February 4, 1972, P.R. Mallory and Old Monsanto executed a similar written

agreement titled "Special Undertaking by Purchasers of Polychlorinated Biphenyls," a copy of

which is attached to the Missouri Complaint as Exhibit 6 (the "Gillette SUA," and collectively

with the Paramount SUA, GE SUA, Magnetek SUA, and Kyocera SUAs, the "SUAs").[5]  Old

Monsanto signed the Gillette SUA in Missouri, thereby, according to Solutia, conducting the

final act to make the Gillette SUA binding.  (Missouri Complaint at 28; Gillette SUA at 2.)

With little variation, the SUAs each state that:

> Accordingly, [Movant] hereby covenants and agrees that, with respect to any and all PCB's sold or delivered by or on behalf of [Old] Monsanto to [Movant] on or after the date hereof and in consideration of any such sale or delivery, [Movant] shall defend, indemnify and hold harmless [Old] Monsanto, its present, past and future directors, officers, employe[e]s and agents, from and against any and all liabilities, claims, damages, penalties, actions, suits, losses, costs and expenses arising out of or in connection with the receipt, purchase, possession, handling, use, sale, or disposition of such PCB's by, through or under [Movant], whether alone or in combination with other substances, including, without implied limitation, any contamination of or adverse effect on humans, marine and wildlife, food, animal feed or the environment by reason of such PCB's. . . .  Nothing herein shall create or imply any duty or obligation: (i) of [Old] Monsanto to sell or deliver any PCB's to [Movant].

(Paramount SUA, GE SUA, Magnetek SUA, Kyocera SUAs, and Gillette SUA, each at 1–2.)

### C.  The Sale of PCBs Under the SUAs and Subsequent Ban of PCBs

Based on available records, Westinghouse purchased 37,674,937 pounds of PCBs from

Old Monsanto from 1972 to 1977.  (Missouri Complaint at 17.)  GE purchased 59,910,405

---

[5]    Gillette is the successor-in-interest to P.R. Mallory & Co. Inc.  On February 28, 1980, P.R. Mallory changed its name to Duracell International Inc.  On June 29, 1989, Duracell International Inc. and Duracell Inc. merged with Duracell Inc. as the surviving company.  On December 31, 1998, Duracell Inc. merged into The Gillette Company.  On August 25, 2016, The Gillette Company entered into a merger agreement with Gillette, with Gillette as the surviving entity.  (Missouri Complaint, at 8.)

pounds of PCBs from Old Monsanto from 1972 to 1977.  (*Id.*)  Universal purchased 11,918,600

pounds of PCBs from Old Monsanto from 1972 to 1977.  (*Id.*)  Aerovox purchased 9,395,500

pounds of PCBs from Old Monsanto from 1972 to 1977.  (*Id.*)  Finally, P.R. Mallory purchased

7,060,700 pounds of PCBs from Old Monsanto from 1972 to 1977.  (*Id.*)

In 1976, Congress enacted the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §

2601, *et seq.*, which required the Environmental Protection Agency (the "EPA") to promulgate

rules on the continued use of PCBs.  (Missouri Complaint at 15–16.)  Old Monsanto ceased

selling PCBs in 1977.  (*Id.* at 16.)  Then, in 1979, the EPA banned the intentional manufacture of

PCBs without consent pursuant to the TSCA.  (*See id.* (citing 40 C.F.R. § 761.1, *et seq.*).)

### D.  Old Monsanto's Spin-Off of Solutia Inc. and its Separation from its Agriculture Business

In 1997, Old Monsanto decided to divest substantially in all its chemical business.  (*See*

*Declaration of Jeffery N. Quinn In Support of Chapter 11 Petitions and Request for First-Day*

*Relief* (the "First Day Declaration," ECF Doc. # 23 at 6).)  To accomplish this goal, Old

Monsanto created Solutia in April 1997.  (*Id.*)  Then, in September 1997, Old Monsanto spun-off

Solutia (the "Spin-off") pursuant to a Distribution Agreement, between Solutia and Old

Monsanto, as amended from time to time, a copy of which is attached to the Solutia Objection as

Exhibit B (the "Distribution Agreement").  (*Id.* at 6.)  Pursuant to the Distribution Agreement,

Solutia (1) assumed the financial responsibility for all liabilities arising from or related to Old

Monsanto's chemicals business, and (2) indemnified Old Monsanto against all liabilities relating

thereto.  (*Id.*)  These liabilities included, without limitation, asbestos liabilities; general product

liabilities; healthcare, life, disability, and pension liabilities arising from or related to Old

Monsanto's employees; environmental remediation and compliance liabilities; litigation

11

liabilities arising from or related to Old Monsanto's use or release of chemical products,
including PCBs, in its operations (collectively, the "Legacy Liabilities"). (*Id*. at 3–4.)

The Distribution Agreement required Solutia and Old Monsanto to "execute[ ]
instruments of assignment and transfer and to take such other corporate action as is necessary to
transfer to [Solutia] . . . all of the right, title and interest of the Monsanto Group in the Chemical
Assets." (Distribution Agreement, Section 2.03, at 17.) On September 1, 1997, an Assignment
and Assumption Agreement was executed by Old Monsanto and Solutia (the "Assignment and
Assumption Agreement"), a copy of which is attached to the Solutia Objection as Exhibit C. The
Assignment and Assumption Agreement states: "[Old] Monsanto hereby sells, assigns and
conveys unto [Solutia] all of the right, title and interest of the Monsanto Group in and to all of
the Chemicals Assets not heretofore transferred to [Solutia]." (Assignment and Assumption
Agreement, at ¶ 1.) "Chemicals Assets" as used in the Assignment and Assumption Agreement
has the meaning ascribed to it in the Distribution Agreement. (*Id.* at ¶ 3.) The Distribution
Agreement defines "Chemical Assets" to include "all rights under insurance policies and all
rights in the nature of insurance, indemnification or contribution." (*See* Distribution Agreement,
Art. I, at § 1.01(11); *id*., Art. I, at § 1.01(7)(xvi).)

In 2000, Old Monsanto began to exit the agriculture business. (First Day Declaration at
7.) To that end, Old Monsanto entered a series of transactions, whereby Old Monsanto
transferred its agriculture business to Monsanto Company f/k/a Monsanto AG Company ("New
Monsanto"). (*Id*.) In doing so, Old Monsanto and New Monsanto entered into a separation
agreement, a copy of which is attached to the Solutia Objection as Exhibit D ("Separation
Agreement"). Under the Separation Agreement, New Monsanto agreed to indemnify Old
Monsanto for (1) all liabilities arising from or related to its agriculture business, and (2) all

liabilities arising from or related to its chemical business, including the Legacy Liabilities in the event Solutia failed to perform its indemnity obligations. (First Day Declaration at 7.)

On or about July 1, 2002, New Monsanto, Old Monsanto, and Solutia entered into an amendment to the Distribution Agreement, whereby Solutia agreed to indemnify New Monsanto for the same liabilities it had agreed to indemnify Old Monsanto in the Distribution Agreement. (*Id.* at 8.) From 1997 to 2003, the Legacy Liabilities caused Solutia financial distress. (First Day Declaration at 8–11.) In September 2003, Solutia, New Monsanto, and Old Monsanto settled lawsuits involving 20,000 plaintiffs in state and federal courts in Alabama. (*Id.* at 20.) These lawsuits related to Old Monsanto's discharge of PCBs from its Anniston, Alabama plant from 1935 to 1970 (the "Anniston PCB Plant Litigation").

Solutia engaged in several efforts to pay the Legacy Liabilities as they came due. (*Id.* at 20–24.) But these efforts were futile, and Solutia filed for protection under Chapter 11 of the Bankruptcy Code on December 17, 2003 (the "Petition Date"). (*Id.*; "Voluntary Petition," ECF Doc. # 1 at 1.)

### E. Global Settlement and Plan of Reorganization

Over the course of four years, Solutia negotiated a comprehensive settlement with stakeholders (the "Global Settlement") which served as the foundation for a plan of reorganization. The terms of the Global Settlement were set forth in a settlement agreement (the "Settlement Agreement") that was incorporated into Solutia's plan of reorganization. (*See* Plan, Exs. A–P.)

On November 21, 2007, Solutia filed its Supplemental Memorandum of Law in Support of the Global Settlement ("Supplemental Memo in Support," ECF Doc. # 4358),[6] outlining,

---

[6]    Attached to the Supplemental Memo in Support is the Debtors' Memorandum in Support of Solutia's Motion for Approval of the Monsanto Settlement and Retiree Settlement (the "Original Memo in support," ECF

among other things, Solutia's restructuring efforts and the terms of the Global Settlement.  The Supplemental Memo in Support describes the all-encompassing nature of the Global Settlement and the allocation of Legacy Liabilities, which included far more liabilities than merely PCB liabilities.

First, New Monsanto would assume responsibility for "Legacy Tort Claims" which included, among other things, claims relating to exposure to various chemicals, including, without limitation, PCBs.  (Supplemental Memo in Support at 5.)  Based upon the proofs of claim filed as of November 2007, Solutia estimated that the aggregate value of the Legacy Tort Claims could range from $15 to $40 million.  (*Id.*)  But that estimate did not "account for claims that could be asserted in the future related to pre-spin conduct, defense costs, or the hundreds of additional lawsuits that have been commenced directly against Monsanto (for which [New] Monsanto could have asserted potentially billions of dollars in surrogate claims against Solutia)." (*Id.*)

Second, New Monsanto agreed to assume financial responsibility for "Environmental Liabilities" which included remediation costs in connection with properties previously transferred to Solutia, among other liabilities.  (*Id.* at 6.)  The assumption of Environmental Liabilities would, at a minimum, "remove approximately $150 million worth of complex environmental claims from Solutia's estates."  (*Id.*)  Moreover, New Monsanto agreed to take responsibility for the "remediation of dioxin contamination in the Kanawha River" which "could [have] cost between $100 million and $500 million" according to expert environmental analysis. (*Id.*)

---

Doc. # 3976) filed on June 29, 2007.  The Original Memo in Support was filed in connection with an earlier iteration of the Global Settlement but continued to provide helpful background information.

Third, the Global Settlement resolved all New Monsanto's and Old Monsanto's claims against Solutia. (*Id.* at 7.)  New Monsanto's claim alone was estimated in the amount of $825 million, consisting of, among other things, (i) $215.9 million in indemnifiable Legacy Liabilities incurred after the Petition Date, (ii) $179 million in future environmental and tort liabilities, and (iii) $428 million in indemnifiable liabilities incurred in connection with settling the Anniston PCB Litigation. (*See* Original Memo in Support at 24.)

In exchange for New Monsanto's participation in the Global Settlement, in satisfaction of its claim, and in consideration of Monsanto "taking financial responsibility for significant Legacy Liabilities," New Monsanto would receive a payment from the Debtors' estates of "$175 million in cash" (or an alternative amount of cash plus stock in the reorganized debtors), which consideration was decreased following objections to a prior version of the proposed settlement from certain of the Debtors' stakeholders "that Monsanto was receiving too great of a recovery" under a prior iteration of Debtors' Plan. (Supplemental Memo in Support at 3, 8.)  Along with this payment, the Monsanto Settlement and Plan provided New Monsanto with an allowed administrative claim, the payment of professional fees, and several broad releases. (*Id.* at 2.)

On November 29, 2007, this Court entered its *Order Confirming Solutia's Fifth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and Approving the Global Settlement, Monsanto Settlement and the Retiree Settlement* (the "Confirmation Order," ECF Doc. # 4444), thereby approving the Plan, the Global Settlement, and the Settlement Agreement.

Pursuant to the Confirmation Order and Plan, Legacy Tort Claims (as defined in the Plan) were not discharged and survived the occurrence of the Effective Date of the Plan. (Plan at 27.)

15

The Confirmation Order preserved "any and all Causes of Action," which includes "indemnity claims." (Confirmation Order ¶ 89; Plan, Art. I (A)(33).)

With respect to executory contracts, the Plan provides that: "On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that" were listed as assumed in other portions of the Plan or addressed in other specified filings, including those listed on Exhibit F to the Plan Supplement. (Plan, Art. VI (A); Buchweitz Decl. Ex. 19; Plan Suppl. Ex. F.)

The SUAs were not listed on Exhibit F to the Plan and were not addressed in any of the Debtors' other filings as contracts to be assumed on or before the Effective Date. The Confirmation Order provided that upon the occurrence of the Effective Date, the Confirmation Order would constitute the approval "pursuant to section 365(a) and 1123(b)(2) of the Bankruptcy Code . . . of the rejection of the executory contracts . . . rejected pursuant to the Plan." (Buchweitz Decl. Ex. 2, Confirmation Order ¶ 67.)

### F.  The Post-Confirmation PCB Lawsuits

From 2009 to present, Reorganized Solutia was named a defendant in certain PCB lawsuits that, in part, survived this Bankruptcy Case arising from or related to the sale or delivery of PCB products, known as the "Food Chain Cases," the "Water Cases," the "School Cases," and the "Occupational Cases" (collectively, the "PCB Lawsuits"). (Missouri Complaint at 44–50, Exhibits 8–17.) In 2016, all existing Food Chain Cases settled. (Missouri Complaint at 45.) With respect to the Water Cases, several plaintiffs settled their claims by 2020. (*Id.* at 47.) By

16

2022, some of the School Cases were liquidated at trial, and other School Cases settled.  (*Id.* at 49.)  And in 2021, one of the Occupational Cases settled, but other Occupational Cases remain outstanding.  (*Id.* at 50.)

Solutia states that the Anniston PCB Plant Litigation and the PCB Lawsuits are predicated on separate and distinct facts.  (*Compare* "Second Amended Disclosure Statement," ECF Doc. # 4014 at 117–118 *with* Missouri Complaint at 44–50.)  Specifically, the Anniston PCB Plant Litigation focused on tort liability arising from or related to Old Monsanto's discharge of PCBs at its Anniston plant.  (Second Amended Disclosure Statement at 117–118.)  In contrast, Solutia argues that PCB Lawsuits focus on tort liability arising from or related to the sale and delivery of PCBs to customers.  (Missouri Complaint at 44–50.)

### G.  The Parties' Pre-Missouri Litigation Correspondence and Tolling Agreements

On August 18 and 29, 2016, Pharmacia, Monsanto, and Solutia (collectively, the "Missouri Plaintiffs") sent GE and CBS Corporation (Paramount's predecessor) each a letter seeking indemnity on account of its SUA for a long list of lawsuits in which the Missouri Plaintiffs had been sued by plaintiffs seeking damages for personal injury, environmental cleanup, and property damage "caused by exposure to" PCBs manufactured and sold by Old Monsanto, including cases that had been settled or in which judgments had already been entered. (Missouri Compl., Ex. 21; Murray Decl. Ex. 11, Letter from R. Mariani to T. Hill (Aug. 18, 2016).)  Thereafter, the Missouri Plaintiffs tendered additional cases to GE and Paramount through a series of letters, continuing through 2022.  (Motion to Reopen ¶ 33.)  Each of Paramount and GE consistently rejected these tenders and declined to indemnify the Missouri Plaintiffs.  (*Id.*)

During this series of correspondence with the Missouri Plaintiffs, each of Paramount and
GE entered into tolling agreements with the Missouri Plaintiffs. (Motion to Reopen ¶ 34.) On
November 8, 2018, Paramount agreed to a tolling agreement with Monsanto (the "Paramount
Tolling Agreement"), with both parties agreeing not to file an action seeking to establish the
parties' rights under the Westinghouse SUA. (Noethiger Decl. ¶ 11.) Monsanto sent a notice of
termination of the Paramount Tolling Agreement on October 25, 2022. (*Id.*) On April 7, 2017,
GE entered into a tolling and standstill agreement with the Missouri Plaintiffs (the "GE Tolling
Agreement"), which was amended on February 9, 2018. (Murray Decl., ¶ 19.) The GE Tolling
Agreement expired by its terms in May 2019. (*Id.*)

## H.  SUA Enforcement Actions

On May 12, 2017, Magnetek filed a defensive declaratory judgment lawsuit against
Reorganized Solutia, New Monsanto, and Old Monsanto in the Superior Court of New Jersey
(Case No. BER-L-3362-17, the "New Jersey Action"). In the New Jersey Action, Magnetek
asked the New Jersey court to enter a declaratory judgment finding that the Magnetek SUA is
void and unenforceable as against Magnetek, in whole or in part, but did not raise the
bankruptcy-related defenses to liability it is now attempting to assert in this Court. (Solutia
Objection ¶ 31.)

On August 3, 2022, the Missouri Plaintiffs filed the Missouri Complaint in the Missouri
State Court (the "SUA Enforcement Action," Cause No. 17SL-CC03368) against GE and
Paramount, among others. (*See* Missouri Complaint.) The Missouri Complaint in the SUA
Enforcement Action asserts claims for breach of contract, negligence, declaratory judgment, and
contribution against each of the six defendants, including the Movants, relating to the millions of

pounds of PCBs that those defendants purchased from Old Monsanto.  (*See* Missouri Complaint at 57–61.)

On February 20, 2023, GE filed a Notice of Removal of the SUA Enforcement Action in the District Court (Case No. 4:23-CV-00204) a copy of docket is attached to the Solutia Objection as Exhibit F (the "Removal Action").  On March 21, 2023, Solutia filed a motion to remand (the "Motion to Remand") the SUA Enforcement Action from federal court to Missouri state court.  (*See* Removal Action, at Docket Nos. 52–53.)  The Motion to Remand is fully briefed and remains pending before the Missouri District Court.

On July 24, 2023, the New Jersey Superior Court (the "New Jersey Court") granted Old Monsanto, New Monsanto, and Reorganized Solutia's motion to dismiss the New Jersey Action on comity grounds.  *Magnetek, Inc. v. Monsanto Company, Pharmacia LLC F/K/A Monsanto, Solutia Inc.* L-3362-17 (New Jersey Super. Ct. Bergen County July 24, 2023).[7]  The New Jersey Court found that the State Court was the proper venue to address the enforceability of the SUAs despite the fact the New Jersey Action had been filed before the SUA Enforcement Action.  *Id.* at 20.  The New Jersey Court did so for a litany of reasons, including that it appeared that Magnetek had filed the New Jersey Action preemptively as a litigation tactic in a forum in which it had no connection.  *See id*. at 17 ("[t]he possibility, even probability, that Magnatek filed preemptively in a forum with which it had no connection further weighs in favor of dismissal in favor of Missouri").  The New Jersey Court further deferred to the State Court because it would be able to adjudicate all issues raised regarding the SUAs, both against the Movants, but also amongst the Movants.  *Id*. at 14–15.  Permitting resolution of the issues raised regarding the SUAs in the Missouri Action would avoid inconsistent results and a waste of judicial resources.

---

[7]        A copy of the decision is attached to the Solutia Objection as Exhibit E.

*Id*. at 17–18.  Finally, the New Jersey Court was most persuaded by the fact that the arguments

for dismissal of the Missouri Action in favor of the New Jersey Action were presented to the

Missouri State Court, and that court determined that Missouri State Court was the correct forum

for adjudicating all issues surrounding the SUAs.  (*Id.* at 18)

## I.    Prior Representations and Litigation Regarding the SUAs

In the years before the Missouri Plaintiffs' filing of the SUA Enforcement Action, the

Movants argue that those parties made several inconsistent representations to courts regarding

(1) which entity has the right to enforce the SUAs (and why) and (2) which entity bears liability

for the PCB suits underlying the Missouri Plaintiffs' indemnity claims against Paramount and

GE.  (Motion to Reopen ¶ 38.)  First, between 2011 and 2016, in affirmative defenses asserted in

their answers filed in at least fifteen of the cases for which the Missouri Plaintiffs now seek

indemnity from GE and Paramount, each of Solutia, Monsanto, and Pharmacia argued, in

varying forms, that plaintiffs' PCB tort claims were barred "due to Solutia's bankruptcy

discharge in February 2008, and plaintiffs' failure to comply with the bankruptcy claims bar

date."[8]  By contrast, the Movants argue, contrary to its current position in the SUA Enforcement

Action, that Solutia also claimed plaintiffs in these cases improperly sought to hold Solutia liable

for the acts of Old Monsanto in relation to the sales of PCBs between 1935 and 1977, because

Solutia took the position that it was not a successor to Old Monsanto for those liabilities.

(Motion to Reopen ¶ 38.)

---

[8]    Buchweitz Decl. Ex. 21, *Walker v. Monsanto Co.*, No. 1122-CC-09621, Defendants' Am. Answer & Aff.
Defenses (Dec. 7, 2011); Buchweitz Decl. Ex. 22, *Stapleton et al. v. Monsanto Co.*, No. 1122-CC09622,
Defendants' Am. Answer & Aff. Defenses (Dec. 2, 2011); Buchweitz Decl. Ex. 23, *Bailey v. Monsanto Co. Bo.*
4:15-cv-00844, Defendants' Answer & Aff. Defenses to Petition (May 28, 2015); Buchweitz Decl. Ex. 24, *Olson v. Monsanto Co.*, Answer & Aff. Defenses (April 20, 2016).

Second, in *Town of Lexington v. Pharmacia Corp.*, a PCB tort litigation filed in the

District Court for the District of Massachusetts in 2012, Solutia and Monsanto moved for

summary judgment, arguing they were "mere indemnitors" of Pharmacia/Old Monsanto "against

which a direct cause of action does not lie."  No. 12-CV-11645, 2015 WL 1321457, at *2 (D.

Mass. Mar. 24, 2015).  That court disagreed, and it found that Solutia was judicially estopped

from arguing that it did not assume liabilities from Pharmacia in the Spin-off because "Solutia

represented to the bankruptcy court that it had assumed liabilities from Pharmacia in its spin-off,

which is plainly inconsistent with the position it now asserts."  *Id*. at *5 (emphasis added).

Similarly, in *Bailey v. Monsanto*, Solutia, Monsanto, and Pharmacia removed the case to federal

district court, arguing that Solutia and Monsanto had been fraudulently joined in an attempt by

plaintiffs to avoid diversity jurisdiction because neither Monsanto nor Solutia was a successor in

the PCB tort liabilities of Old Monsanto, and thus were improper defendants.  176 F. Supp. 3d

853, 855 (E.D. Mo. 2016).  In *Bailey*, Solutia also argued that "legacy" PCB tort claims had been

reallocated to "New Monsanto," but that court followed the reasoning in *Town of Lexington* and

found that the Plan made clear that "Solutia retained the liability it assumed by virtue of the

Distribution Agreement."  *Id.* at 861, 867.  The Missouri Plaintiffs now seek indemnity from

Paramount and GE for the settlement they reached in *Bailey*.  (*See* Missouri Compl., Ex. 21.)

## II.    OBJECTIONS

The Solutia Objection and the Monsanto Objection Joinder argue that the case should not

be reopened because there is another court, the Missouri Courts, that can provide all the relief

they are seeking and because the reopening would prejudice the Debtors since they would have

to hire professionals, pay fees and file monthly operating reports.

### III.  JOINDERS

The other SUA Parties join in the arguments of the Movants and, as whole, do not make

factually specific or unique arguments about why the case should be reopened.  All the joinder

parties reserved the right to be heard during the hearing.

### IV.  LEGAL STANDARD,

#### A.  Motion to Reopen

Pursuant to section 350(b) of the Bankruptcy Code, "[a] case may be reopened in the

court in which such case was closed to administer assets, to accord relief to the debtor, or for

other cause."  11 U.S.C. § 350(b).  "Cause" is not defined in the Bankruptcy Code, *see, e.g.*, *In

re Mortensen*, 444 B.R. 225, 227 (Bankr. E.D.N.Y. 2011) and reopening a bankruptcy case under

section 350(b) of the Bankruptcy Code "invoke[s] the exercise of a bankruptcy court's equitable

powers, which is dependent on the facts and circumstances of the case."  *Katz v. L.A. Alliance

Corp. (In re I. Appel Corp.),* 104 Fed. App'x 199, 200 (2d Cir. 2004) (quoting *State Bank of

India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1307 (2d Cir.1996)).

Ultimately, the determination whether a case should be reopened for "other cause" is

committed to the "broad discretion" of the bankruptcy court.  *Batsone v. Emmerling (In re

Emmerling),* 223 B.R. 860, 864 (B.A.P. 2d Cir. 1997).  In exercising this discretion, the court

may consider numerous factors including equitable concerns.  *See In re Mortensen,* 444 B.R. at

227, 231 (granting motion to reopen Chapter 7 case).  In *In re Easley-Brooks* this Court

identified certain factors (the "*Easley* Factors") that courts should consider when deciding to re-

open a case: (1) the length of time that the case was closed; (2) whether a nonbankruptcy forum

has jurisdiction to determine the issue which is the basis for reopening the case; (3) whether in

prior litigation the bankruptcy court determined that a state court would be the appropriate

forum; (4) whether any parties would suffer prejudice should the court grant or deny the motion

to reopen; (5) the extent of the benefit to the debtor by reopening; and (6) whether it is clear at

the outset that no relief would be forthcoming by granting the motion to reopen.  *See In re

Easley-Brooks*, 487 B.R. 400, 407 (Bankr. S.D.N.Y 2013) (*citing In re Otto*, 311 B.R. 43, 47

(Bankr. E.D. Pa. 2004)).  When weighing these factors, a court ought to emphasize substance

over technical considerations.  *Id.* at 406–407.

### B.  Abstention

Permissive abstention may be granted "in the interest of justice, or in the interest of

comity with state courts or respect for state law."  28 U.S.C. § 1334(c)(1).  This Court considers

several factors to determine whether abstention is warranted, including: (1) the effect or lack

thereof on the efficient administration of the estate if a court recommends abstention; (2) the

extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or

unsettled nature of the applicable state law; (4) the presence of a related proceeding commenced

in state court or other nonbankruptcy court; (5) the jurisdictional basis, if any, other than 28

U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main

bankruptcy case; (7) the substance rather than form of an asserted "core" proceeding; (8) the

feasibility of severing state law claims from core bankruptcy matters to allow judgments to be

entered in state court with enforcement left to the bankruptcy court; (9) the burden on the court's

docket; (10) the likelihood that the commencement of the proceeding in a bankruptcy court

involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and

(12) the presence in the proceeding of nondebtor parties.  *See In re Old Carco LLC*, 636 B.R.

347, 357–358 (Bankr. S.D.N.Y. 2022); *Peterson v. 610 W. 142 Ownership Corp. (In re 610 W.

142 Owners Corp.)*, No. 94 B 44488, 1999 WL 294995, at *3–4 (S.D.N.Y. May 11, 1999)

(abstaining under 28 U.S.C. § 1334(c)(1) because non-core claims were wholly a matter of state-law); *Gassman v. Gassman, Griper & Golodny*, No. 097 Cir. 0093, 1997 WL 603439, at *1–4 (S.D.N.Y. Sept. 30, 1997) (abstaining under 28 U.S.C. § 1334); *In re Motors Liquidation Co.*, 457 B.R. 276, 288–93 (Bankr. S.D.N.Y. 2011) (permissively abstaining under 28 U.S.C. § 1334).  The court may consider one or more of these factors but need not analyze all twelve.  *In re Old Carco LLC*, 636 B.R. at 358.  Further, a bankruptcy court may abstain "in favor of another federal court or tribunal, just as it can abstain in favor of a state court." *Id.* (quoting *In re Motors Liquidation Co.*, 457 B.R. at 288–89 (abstaining in favor of another federal court)).

## V.   DISCUSSION

### A.  Motion to Reopen

As an initial matter, the Movants have standing to bring the Motion to Reopen. Nevertheless, the Court concludes that the case should not reopened.  The relevant factors, considered in turn below, do not weigh in favor of reopening the case.  Most importantly, there is another court (either federal or state) that has the requisite jurisdiction and expertise to decide all issues the Movants ask this Court to decide.

### 1.  The Movants Have Standing

The Second Circuit has not yet defined who is a "party in interest" in the context of reopening a bankruptcy case.  *In re Riley*, No. 13–61356, 2017 WL 4334033, at *4 (Bankr. N.D.N.Y. Sept. 28, 2017).  But this Court has held that the categories enumerated in section 1109 are "not meant to exclude other types of interested parties" and that the meaning of a "party in interest" must be determined on an "ad hoc" basis.  *In re Johns-Mansville Corp.*, 36 B.R. 743, 747–48 (Bankr. S.D.N.Y. 1984) (finding future claimants to be parties in interest); *In re Reyes*, No. 14-13233 (SMB), 2015 WL 4624156, at *3–4 (Bankr. S.D.N.Y. Aug. 4, 2015) (party whose

24

legal duties would be impaired by the bankruptcy case can be a party in interest.) "[C]ourts construe [the meaning of "party in interest"] broadly 'to ensure fair representation of all constituencies impacted in any significant way by a Chapter 11 case.'" *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 74 (Bankr. S.D.N.Y. 2009) (citing *Johns-Mansville Corp.* 36 B.R. at 754).

"The basic test under section 1109(b) is "whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation." *Stone Barn Manhattan*, 405 B.R., at 74. "It is generally understood that 'a pecuniary interest . . . directly affected by the bankruptcy proceeding' provides standing under § 1109(b)." *Id.* (citing *Term Loan Holder Comm. v. Ozer Grp., LLC (In re Caldor Corp.)*, 303 F.3d 161 (2d Cir. 2002). The Debtors' Schedules and other bankruptcy filings identify GE and Paramount as potential creditors with numerous claims, making both GE and Paramount "parties in interest." (Motion to Reopen ¶ 45.) The objectors do not contest that the Movants have standing. Accordingly, the Court finds that the Movants have standing.

## 2. The Easley Factors

### a. *The Length of Time the Case was Closed.*

The length of the time the case was closed points to denying the motion at least so long as another court has concurrent jurisdiction to resolve the disputes, as is undisputed in this case. The Solutia bankruptcy case has been closed for more than 13 years. This Court entered its *Order Granting Final Decree Closing the Chapter 11 Cases* (the "Final Decree," ECF Doc. # 4779) on December 29, 2009. (Solutia Objection ¶ 39.) The objectors argue that this time period weighs against reopening the case because the reorganized Solutia today bears little resemblance to the company that emerged from bankruptcy in 2008. (*Id.* ¶ 40.) They also argue

25

that the Movants were made aware of Solutia's intent to exercise rights under the SUAs as early as 2015, and that they have thus delayed for eight years before seeking to reopen the case. (*Id.* ¶ 84.)  The Movants counter that courts do not simply look at the length of the time the case has been closed but at (1) the time between when the movant's reason to reopen the case arose and the filing of the motion to reopen, and (2) whether any delay caused the non-movant some "meaningful prejudice." (Reply ¶ 20 (citing *In re Atari, Inc.*, No. 13-10176 (JLG), 2016 WL 1618346 at*5–6 (Bankr. S.D.N.Y. Apr. 20, 2016) (citation omitted)).)

Here, the Movants were aware of the Missouri Plaintiffs' intentions with respect to the SUAs in 2015, but the parties entered into tolling agreements that precluded Paramount and GE from bringing any action seeking to establish the parties' rights under the SUAs. (Motion to Reopen ¶¶ 34, 61.)  Further, the delay since the SUA Enforcement Action was filed against Paramount and GE in August 2022 has not been lengthy.  The Motion to Reopen was filed two days after the Missouri defendants' motions to dismiss (which have not been ruled upon), the Missouri Courts have made no rulings on the merits of the Missouri Plaintiffs claims against Paramount or GE, and no pending motions in the SUA Enforcement Action raise these issues. (Reply ¶ 21.)  While the delay was eight years, in light of the tolling agreements this fact alone would not be enough to strongly tip the scales against reopening.  But nor does it support reopening now.

The objectors have also not articulated any prejudice from the delay.  Solutia's argument that "Reorganized Solutia itself has undergone numerous divestitures, acquisitions, and corporate reorganizations" and now "bears little to no resemblance to the company that emerged from bankruptcy in 2008" is irrelevant. (*See* Solutia Objection ¶ 40.)  This would be true of any corporation to emerge from chapter 11, and Solutia cites no precedent in support of changes to a

26

reorganized debtor's corporate form constituting prejudice. Solutia must show "some prejudice from the delay for the first *Easley-Brooks* factor to be relevant." *See Atari, Inc.*, 2016 WL 1618346, at *6; *see also In re Stein*, 394 B.R. 13, 16 (Bankr. E.D.N.Y. 2008) (stating that the "mere lapse of time does not constitute prejudice . . ."). Thus, the long period of time between the closing of the case and the Motion to Reopen does not weigh against reopening the case because 1) the Movants did not delay once the tolling agreements expired and 2) the objectors have not established that they are prejudiced by the delay.

At the same time, the period of time does not weigh in favor of reopening the case. Though not articulated in the case law, with a case having been closed this long, there are inherent challenges in reopening the case. The Court's familiarity with the case is much more limited given that a different judge (now retired) oversaw the bankruptcy case. Further, because the Court is required to become familiar with a long period of complicated factual developments, there is a steeper learning curve given the age of the case. Thus, while there is not an undue delay here, on balance, this factor is tips against reopening the case, again because there are other courts no doubt more familiar with PCB litigation who have concurrent jurisdiction.

### b. *Jurisdiction of a Non-Bankruptcy Forum*

A non-bankruptcy court, the Missouri State Court or the Missouri District Court to which the case was removed (with a motion to remand pending) has jurisdiction over the matters raised in the Proposed Motion to Enforce. It is undisputed that either Missouri court possesses concurrent jurisdiction with this Court to decide the bankruptcy-related defenses in the SUA Enforcement Action, as well as all other defenses raised in this action. Those courts can hear and decide whatever defenses the Movants raise.

Bankruptcy courts "routinely decline to exercise their discretion to reopen bankruptcy cases where the parties are seeking or could seek relief in a competent alternative forum." *In re HBLS, L.P.*, 468 B.R. 634, 640 (Bankr. S.D.N.Y. 2012) (collecting cases); *see also Mid–City Bank v. Skyline Woods Homeowners Ass'n (In re Skyline Woods Country Club*), 636 F.3d 467, 472 (8th Cir. 2011) ("[T]he availability of an alternative forum . . . [is] a strong reason not to reopen a closed bankruptcy case."); *Apex Oil Co. v. Sparks (In re Apex Oil Co.)*, 406 F.3d 538, 542 (8th Cir. 2005) ("The availability of relief in an alternative forum is a permissible factor upon which to base a decision not to reopen a closed bankruptcy case."); *Elias v. U.S. Trustee (In re Elias)*, 188 F.3d 1160, 1162 (9th Cir. 1999) (affirming denial of motion to reopen where "the state court is fully capable of resolving the . . . dispute in this case").

While conceding that either Missouri court has concurrent jurisdiction, the Movants argue that the Bankruptcy Court is better-suited to decide the issues. (Reply ¶ 10.)  The Movant's argument rests on the premise that because this dispute regards interpretation of this Court's Plan and Confirmation Order, the Bankruptcy Court is best positioned to resolve it. (*Id.* ¶ 9.)  In support, the Movants cite *In re Atari, Inc.* (Reply ¶ 12 (citing 2016 WL 1618346, at *8).)

*Atari* is illustrative of the situation in which a Court reopens a case, notwithstanding the fact that another court has the jurisdiction and competence to resolve the dispute.  But *Atari* is distinguishable.  In *Atari*, a creditor, Alden, sought to reopen the bankruptcy case to enjoin violations of the plan and confirmation order.  *Id.* at 1.  Following confirmation of the plan, the Debtor brought proceedings in the Tribunel de Commerce de Paris (the "Commercial Court of Paris") to recoup certain alleged overpayments from Alden.  Alden argued that the action in the Commercial Court of Paris violated releases in the plan and that the Bankruptcy Court had

28

exclusive jurisdiction over interpreting and enforcing the plan. *Id.* The plan specifically

provided for a release of "Alden and its affiliates" and the "Plan also provided for this Court to

retain exclusive jurisdiction to the fullest extent permitted by law, to . . . hear and determine

disputes or issues arising with the interpretation, implementation, or enforcement of the Plan."

*Id.* at 2 (internal citations and quotations omitted). The *Atari* court acknowledged, and cited

several cases, where a court declined to reopen a case where there was a competent alternative

forum that had jurisdiction. *Id.* at *7–8. The court reasoned that notwithstanding the fact that

the Commercial Court of Paris was competent to handle the dispute, the releases were essential

and integral to the consummation of the plan, and even if the Court did not have exclusive

jurisdiction, it was the most *appropriate* forum given its familiarity with the releases. *Id.* at 8.

Here, unlike in *Atari* where the Plan included specific treatment and release of Alden, the

Plan and Confirmation Order do not include specific treatment of GE and Paramount that a court

is being asked to interpret or enforce. Instead, the Court is being asked to consider 1) whether

the SUAs are executory and 2) whether the objectors are estopped from enforcing the SUAs

given that Solutia did not disclose them. Further, unlike in *Atari*, the Court is not being asked to

interpret the text of a release that it approved via the Plan. There is no dispute here whether the

Plan rejected executory contracts; rather, the dispute is whether these contracts are executory.

While the concept of an executory contract is bankruptcy related, it also turns on the application

of Missouri law, which must be applied to determine whether the outstanding obligations are

material. (*See* Solutia Objection ¶ 69 (laying out Missouri law on material breaches).) Further,

in *Atari*, the releases were "essential to the Plan." Although here, the Movants take pains to

argue that the SUAs related to tort claims that were central to the global settlement, the SUAs

were not a pivotal part of the Plan process for the very simple reason that they were not noted as

part of the settlement or included in the plan documents.  Given that at its core this dispute

involves a question of contract law, and not an interpretation of the Plan, it is not clear that as in

*Atari*, the Court here has any special familiarity with the issues that make it more appropriate

than another court with concurrent jurisdiction to resolve the disputes, particularly since the

contracts appear to be governed by Missouri law.

The Movants make two other arguments about why the Bankruptcy Court is the most

appropriate forum to consider these issues.  Both fail.

First, the Movants argue that the Debtors have made inconsistent representations about

the SUAs that threaten the integrity of the bankruptcy system.  (Reply ¶ 13.)  The thrust of this

argument is that Solutia has represented that (1) PCB Tort Claims were discharged in Solutia's

Plan and the Confirmation Order, and (2) Solutia is not a successor to the PCB tort liabilities of

Old Monsanto under the terms of the Monsanto Settlement (*see* Motion to Reopen ¶¶ 37–39), but

is now representing that Solutia retains those same PCB liabilities and asserting that Monsanto

gained rights to the SUAs based on provisions in the agreements.  (Reply ¶ 13.)

It is not entirely clear that asserting rights under the SUAs is inconsistent with the

argument that the PCB tort claims were discharged by the Plan.  The Debtors argued

unsuccessfully in district court that these tort claims were discharged under the Plan.  For

example, in *Town of Lexington v. Pharmacia Corp.*, Solutia and Monsanto argued they were

"mere indemnitors" of Pharmacia/Old Monsanto "against which a direct cause of action does not

lie," but the court disagreed, finding that Solutia's representations to the Bankruptcy Court were

"plainly inconsistent with the position it now asserts."  No. 12-CV-11645, 2015 WL 1321457, at

*2 (D. Mass. Mar. 24, 2015) (emphasis added); *see also Bailey v. Monsanto Co.*, 176 F. Supp. 3d

853, 867 (E.D. Mo. 2016) ("Solutia retained the liability it assumed by virtue of the Distribution

Agreement," given the effect of the Monsanto Settlement and provisions in the Plan deeming

Tort Claims unaffected by the chapter 11 cases.).  But it is not clear that arguing (unsuccessfully)

that the Plan discharged tort claims is inconsistent with the argument that to the extent Solutia is

liable for tort claims, that its rights under the SUAs remain intact.  The question whether the

Debtors are liable for tort claims is distinct from the question of who must pay for these tort

claims under an indemnity agreement.

The *Lexington* and *Bailey* cases indicate that district courts have not hesitated to bar

Solutia from making inconsistent arguments.  These courts found that the Debtor was judicially

estopped from making representations that are inconsistent with those they made during the

bankruptcy.  To the extent there are concerns about inconsistent representations threatening the

bankruptcy system, the Movants are entitled to raise these issues, and the state or federal courts

are more than capable of ruling on those issues.  But given the fact that these representations do

not appear facially inconsistent, this alone does not make this Court more appropriate than a

district or state court to resolve these issues.

Finally, Solutia argues that because Solutia is party to SUAs with dozens of other

companies, nearly all of whom are not parties in the SUA Enforcement Action, the Court's

ruling here could have a material impact on those issues and prevent piecemeal determinations.

(Reply ¶ 14.)  But part of the Movants' argument is that *their* SUAs are different from other

SUAs, since they bargained for additional rights than those included in a standard SUA.  (*See*

Motion to Reopen ¶ 2 ("Paramount and GE negotiated for material opposing obligations on the

part of Old Monsanto, which were not included on Old Monsanto's form SUA, including the

requirement that Old Monsanto provide substantial cooperation in the defense of PCB-related

lawsuits and, with respect to GE, provide timely notice of any claims for indemnity under the GE

SUA.").)  These additional obligations may mean that the analysis the Court applies to whether

the SUAs here are executory will not apply to other SUAs not before the Court.  Further, the

Debtors point out that the SUA Enforcement Action involves other state law issues outside of the

bankruptcy related defenses.  (Abstention Reply ¶ 8.)  It appears that deciding these issues in the

Bankruptcy Court would lead to piecemeal litigation since after the Bankruptcy Court decided

these issues the Missouri Courts would then have to resolve the remaining issues.  Accordingly,

given the availability of the Missouri Courts to resolve all issues, this factor weighs heavily in

favor of declining to reopen the case.

### c.   *Whether Prior Litigation Determined that a Non-Bankruptcy Court was the Appropriate Forum*

Because the Plan allowed for the tort claims that implicate the SUAs to ride through the

bankruptcy and be litigated in state court, there is evidence that this Court found that state court

was the appropriate forum to litigate tort claims and related indemnity claims.  Specifically, in

the Confirmation Order and Plan, this Court determined that other courts were the proper forum

to adjudicate Legacy Tort Claims asserted against Solutia, including claims arising from the sale

or delivery of PCBs to the Movants.  (Plan at 27.)  In fact, creditors voted to ensure that Legacy

Tort Claims would be addressed outside of this Court and "resolved by applicable law in the

ordinary course of business."  (*Id.*)

Solutia argues that this "pass-through" provision includes the SUA Enforcement Action

by implication.  The Movants' contractual obligations to defend and indemnify Old Monsanto

are contingent upon the existence of Legacy Tort Claims within the scope of the SUAs.  (*See*

Plan, Definitions, at "Legacy Tort Claims.")  Because the SUA Enforcement Action is

contingent upon the existence of Legacy Tort Claims within the scope of indemnity, Solutia

contends that this Court implicitly determined—through the Confirmation Order—that the

proper forum to resolve the SUA Enforcement Action is another court.  (Solutia Objection ¶ 50.)
It is a stretch to say that this reflected an intention to have state courts resolve these precise
issues, but it is nevertheless reasonable for the Court, in exercising its discretion to conclude, as
the Court does here, that the same non-bankruptcy forum should decide the liability and
indemnity issues.

The Movants counter that the Confirmation Order provided that the Court had exclusive
jurisdiction over disputes regarding the enforcement and interpretation of the Plan and that this
dispute falls under that umbrella.  (Reply ¶ 18.)  First, it is inaccurate as a matter of law that only
a bankruptcy court can interpret a confirmed plan even if the plan or confirmation order
purported to assign exclusive jurisdiction to the bankruptcy court, which this Plan did not.  *See In
re Old Carco*, 636 B.R. at 356 n.3 ("But a court order can neither confer jurisdiction on a court
that is not provided by statute, nor can it strip another court of jurisdiction provided by
applicable law.").  But even so, this dispute does not involve the interpretation of the Plan; it
involves the litigation of bankruptcy-related disputes of contract actions over which the Missouri
state or federal court, as the Movants concede, has concurrent jurisdiction.

The Movants further argue that the Court made no findings concerning whether the
Legacy Tort Claims were more properly adjudicated by "other courts," let alone concerning
which court should adjudicate Movants' arguments that Solutia's claims under the SUAs were
not preserved in its chapter 11 case.  (*Id.* ¶ 17.)  This is an overly technical reading of what
constitutes a "determination" by a court of a proper forum.  *See In re Easley-Brooks*, 487 B.R. at
406–407 (noting that when Courts weigh these factors, a court ought to emphasize substance
over technical considerations).

33

The Bankruptcy Court confirmed a plan that provided for the resolution of a large slate of claims, to which the SUAs are related. Implicit in that determination is that a non-bankruptcy court is an appropriate venue to litigate those issues. The fact that the Bankruptcy Court did not make specific findings of fact does not mean this implicit determination should be discounted.

### d.   The Prejudice to Parties

While Solutia argues that it would be prejudiced by the reopening of this case, the Movants would not be prejudiced by the Court declining to reopen the case. And given that Solutia is not insolvent, reopening the case now would stretch the resources of the Bankruptcy Court from dealing with its primary mission—To "[p]rovide, economically, a fair, consistent, and effective forum for the protection and marshaling of assets, the discharge or adjustment of debts, and timely distribution of property or securities, in accordance with applicable law." *Mission Statement*, UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK, https://www.nysb.uscourts.gov/mission-statement (last visited Aug. 22, 2023). This is particularly so where non-bankruptcy courts are able to resolve the disputes.

Accordingly, this factor weighs against reopening the case. If this Court reopens this Bankruptcy Case, Reorganized Solutia argues it will incur significant administrative costs—(1) United States Trustee fees pursuant to 28 U.S.C. § 1930, (2) quarterly reporting expenses, (3) bankruptcy attorneys' fees, and (4) additional attorneys' fees in the SUA Enforcement Action. Moreover, Reorganized Solutia has the right to a jury trial in the SUA Enforcement Action which may be stripped if this Court enables the Movants to file their Proposed Motion to Enforce. *See State ex rel. Leonardi v. Sherry*, 137 S.W.3d 462, 474 (Mo. 2004) (*en banc*) (counterclaimant has right to jury trial in breach of contract action under Missouri law); *see also* U.S. Const. Amend. VII. (constitutional right to jury trials in civil actions in federal court).

The Movants counter that if the Court considers these circumstances to be prejudice, then in every bankruptcy case the Court would decline to reopen the case because it is always the case that the debtor will have these administrative responsibilities upon reopening.  (Reply ¶ 47.) While it is true that a debtor will always have these administrative responsibilities, it is not always the case that in addition to paying U.S. Trustee fees and legal fees in the bankruptcy, the debtor will continue to have to expend fees defending itself in the non-bankruptcy forum at the same time.  Here, because the Proposed Motion to Enforce would not resolve the SUA Enforcement Action, the Debtor would essentially have to defend itself in two fora, if the Court reopens the case.  In contrast, the Movants articulate no prejudice that would result from the Court declining to re-open the case.  As Solutia correctly argues, the Movants may raise all of their bankruptcy-related defenses in the SUA Enforcement Action and would only be losing the ability to litigate in their preferred forum if the Court declines to reopen the case.  (Solutia Objection ¶ 55.)

### e.    Benefit to Parties from Reopening the Case

Solutia correctly argues that the Debtor would not benefit from reopening the case. Movants argue that courts often consider the benefits to all parties, not just the debtor.  (Reply ¶ 49.)  It is true that courts often consider the benefit to all stakeholders from reopening the case. *See, e.g.*, *In re Koch*, 229 B.R. 78, 86–87 (Bankr. E.D.N.Y. 1999) (citing *In re Maloy*, 195 B.R. 517, 518 (Bankr. N.D .Ga.1996) ("Where a court is called upon to reopen a case, there appear to be three aspects which it should consider, namely, the benefit to the debtor, the prejudice to the affected entity . . . and finally, the benefit to the creditors.")).

Movants cite *Atari* for the proposition that there is a sufficient benefit if reopening the case will allow for enforcement of the global settlement and releases in the Plan.  (Reply ¶ 49

(citing 2016 WL 1618346, at *11).)  But here as noted above, the Movants are not asking the

Court to enforce the global settlement in the Plan; they are asking for this Court to opine on

bankruptcy related defenses to contracts.  It is true courts have held that the need to enforce

rights that were bargained for in a confirmed plan of reorganization constitutes a sufficient

"benefit" to justify reopening a bankruptcy case.  *See Katz v. I.A. Alliance Corp. (In re I. Appel*

*Corp.)*, 300 B.R. 564, 571 (S.D.N.Y.2003) (affirming order reopening a closed case to allow the

debtor to pursue unscheduled causes of action where creditors had "bargained to have the

reorganized debtors retain [those causes of action]" in the confirmed chapter 11 plan).  But in

contrast here, the Movants have identified no rights in the Plan that they bargained for; instead,

what they seek is a determination that Solutia's silence with respect to their SUASs, which they

did not bargain for, precludes the Debtor from enforcing SUAs.

### f.   *Whether Relief on the Merits Would be Forthcoming*

Courts routinely decline to reopen cases where there is no merit to the ultimate relief

being requested.  *See, e.g., Cohen v. CDR Creances S.A.S. (In re Euro–Am. Lodging Corp.)*, 549

Fed. Appx. 52, 54 (2d Cir.2014) (affirming denial of a non-debtor's motion to reopen a closed

chapter 11 case in order to enforce his discharge under the confirmed plan where "the plan

clearly didn't grant a discharge to [the non-debtor]" and "no order [discharging the non-debtor]

could have been issued").  In such a situation, where the ultimate relief being sought has no

merit, reopening the case would be "meaningless."  *State Bank of India v. Chalasani (In re*

*Chalasani)*, 92 F.3d 1300, 1307 (2d Cir. 1996).

The relief the Movants are seeking through the Proposed Motion to Enforce is a finding

that Solutia is precluded from enforcing the SUAs for two alternative reasons.  First, because the

SUAs are executory contracts that were rejected under the terms of the Plan.  Second, because

even if the SUAs were not executory contracts, Solutia failed to disclose the SUAs as assets and is thus judicially estopped from enforcing them. Each argument is considered in turn below; the Court concludes these arguments are *not* clearly without merit. Accordingly, this factor favors reopening the case.

### 1) Executory Contracts

There appears to be no dispute among the parties that if the SUAs were executory contracts they were rejected under the Plan and would not be enforceable. The parties, however, disagree whether the contracts were executory.

Under the Countryman test, "an executory contract [is] one that is not so fully performed that a breach by either side would constitute a material breach of the contract." *Penn Traffic Co. v. COR Route 5 Co., (In re Penn Traffic Co.)*, No. 05-Civ. 3755 (NRB), 2005 U.S. Dist. LEXIS 20407, at *6 (S.D.N.Y. Sept. 16, 2005) (citing Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973)). A contract is considered executory "if 'material future performance obligations remain on both sides' of the contract" under the Countryman test. *Shoppers World Cmty. Ctr., L.P. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)*, No. 01-CV-3934 (SAS), 2001 U.S. Dist. LEXIS 14755, at *20–21 (S.D.N.Y. Sept. 20, 2001) (citing *In re Bluman*, 125 B.R 359, 361–62 (Bankr. E.D.N.Y. 1990)).

Movants argue that the contracts were executory because there were remaining obligations on both sides. They argue Movants had a duty to indemnify and Solutia had obligations to cooperate in the defense of the action. Specifically, Movants argue that GE and Paramount (then, Westinghouse) expressly bargained for cooperation and notice provisions in exchange for their willingness to indemnify Old Monsanto. (Motion to Reopen ¶ 15.) Under the Westinghouse and GE SUAs, Solutia was obligated to cooperate in the defense, accept litigation

37

strategies put forward by Paramount and GE, and make available witnesses and historical expert knowledge regarding the PCB product manufactured exclusively by its predecessor.  (*See* Proposed Motion to Enforce ¶ 55.)  Movants cite case law indicating that these types of obligations have been considered material enough to render a contract executory.  *See In re Avianca Holdings S.A.*, 618 B.R. 684, 702 (Bankr. S.D.N.Y. 2020) (rejecting "the [non-debtors'] argument and [finding] that the obligation to furnish to the Debtors any documents, including powers of attorney, necessary to enable the Debtors to carry out their duties under the Undertaking Agreement [was] a material unperformed obligation"); *Philip Servs. Corp. v. Luntz (In re Philip Servs. (Del.), Inc.)*, 284 B.R. 541, 547–50 (Bankr. D. Del. 2002) *aff'd*, 303 B.R. 574 (D. Del. 2003) (continuing duties to indemnify, on the one hand, and notice and cooperation obligations, on the other, rendered the agreement executory).

Solutia counters that courts have generally held that indemnity agreements are not executory because the only obligation remaining is the one-sided obligation to indemnify.  *See In re Chateaugay Corp.*, 102 B.R. 335, 345, 349 (Bankr. S.D.N.Y. 1989) (holding that contracts are not executory when the only remaining obligation is the payment of money, and holding that indemnity obligations are not sufficient to render a contract executory under the Countryman test because they only require the payment of money); *In re THC Financial Corp.*, 686 F.2d 799, 804 (9th Cir. 1982) (holding that an indemnification agreement was not an executory contract because it only required the payment of money).  But these cases do not address the issue of whether obligations to cooperate in the defense of lawsuits in exchange for an agreement to indemnify render a contract executory.  Solutia cites *In re Chateaugay Corp.*, 102 B.R. 335, 345, 349 (Bankr. S.D.N.Y. 1989) for the proposition that cooperation obligations in indemnity contracts are merely ministerial and are not material obligations that render a contract executory.

But in *In re Chateaugay Corp*. the court held only that the following were not material: obligations to (1) file a notice, (2) contest claims which might give rise to indemnified liability, and (3) provide an indemnitor with notice of claims which might give rise to indemnifications, are immaterial, de minimis, ancillary obligations that do not constitute sufficient obligations to render a contract executory. *Id.* The Court did not consider obligations to cooperate in litigation defense.

Solutia cites several retrospective premium insurance agreement cases where courts held that cooperation requirements were not material, but those cases are distinguishable. *See In re Sudbury, Inc.*, 153 B.R. 776 (Bankr. N.D. Ohio 1993); *Olah v. Baird (In re Baird)*, 567 F.3d 1207 (10th Cir. 2009); *In re Federal-Mogul Glob., Inc.,* 385 B.R. 560, 575 (Bankr. D. Del. 2008). For instance, in those cases, the courts found contracts to be non-executory notwithstanding litigation cooperation provisions because "the policy period had expired and there was therefore nothing to assume, and/or because the insurer's indemnity obligation was not conditioned upon the debtor's payment of retrospective premiums." *See*, *Sudbury, Inc.*, 153 B.R. at 778; *see also Baird*, 567 F.3d at 1212 (insurance policy was not executory where the policy period had expired and insured had paid all premiums owed under the policy); *Federal-Mogul*, 385 B.R. at 575–76 (finding retrospective insurance policies to be non-executory). Even if the Court found that the cooperation obligations were not material, it is simply not the case that the argument that these contracts were executory is completely without merit.

## 2)  Disclosure of SUAs

The Movants next argue that even if the contracts are not executory, the Debtors were required to disclose the SUAs as assets, and having failed to do so, they are precluded from enforcing them now. This argument too may have merit.

Where an action could have been brought before the confirmation of a bankruptcy plan,

res judicata ordinarily bars the debtor from bringing the action after the confirmation of the plan.

*Sure-Snap Corp. v. State St. Bank & Tr. Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (A "confirmation

plan . . . bind[s] its debtors and creditors as to *all* the plan's provisions, and all related, property

or non-property based claims which could have been litigated in the same cause of action")

(emphasis in original).  The overriding goal of judicial estoppel is "to protect the integrity of the

judicial process by prohibiting parties from deliberately changing positions according to the

exigencies of the moment."  *Adelphia*, 634 F.3d at 696 (quoting *New Hampshire v. Maine*, 532

U.S. 742, 749–50 (2001).  Section 1123(b)(3)(B) of the Bankruptcy Code provides an exception

to res judicata, allowing debtors to expressly reserve their rights to claims: "Subject to subsection

(a) of this section, a plan may provide for the retention and enforcement by the debtor, by the

trustee, or by a representative of the estate appointed for such purpose, of any such claim or

interest."  11 U.S.C. § 1123(b)(3)(B).  The application of section 1123(b)(3)(B) is an equitable

doctrine, and whether parties can later raise claims not preserved in a bankruptcy case is a fact-

specific inquiry.  *See Lawski v. Frontier Ins. Grp., LLC* (*In re Frontier Ins. Grp.*), 585 B.R. 685,

703 (S.D.N.Y. 2018), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019) ("The equitable doctrine of judicial

estoppel depends heavily on the specific factual context and is 'probably not reducible to any

general formulation of principle.'") (quoting *New Hampshire v. Maine*, 532 U.S. at 749–51).

A debtor that sufficiently identifies and reserves its contingent claims against defendants

in its plan (including in the plan's disclosure statement) and confirmation order will not be

"precluded by the application of res judicata." *Eastern Air Lines, Inc. v. Brown & Williamson

Tobacco Corp.* (*In re Ionosphere Clubs, Inc.*), 262 B.R. 604, 613 (Bankr. S.D.N.Y. 2001)

(declining to apply res judicata where debtor's plan and disclosure statement specifically

addressed claims against a named party based on a specified contract).  Here, it is undisputed that

the Debtor did not include the relevant SUAs on its schedule of assets.  While the schedules list

numerous insurance policies (*see, e.g.*, Buchweitz Decl. Ex.7, Exs. B-9(a), B-9(b)), and

executory contracts described as "indemnity agreements" (*see, e.g., id.* at Ex. G-1 90, 391), the

schedules neither list SUAs with Paramount or GE, or SUAs with any other entity, as executory

contracts nor schedule any SUAs as assets, which would purportedly provide indemnity for the

Debtors' substantial tort liabilities.

Solutia argues that this lack of disclosure is not fatal to its ability to enforce the SUAs for

two reasons.  First, it argues that disclosure was not required because the causes of action for

indemnity were not "known" before confirmation.  Second, it argues that specific disclosure was

not required because Solutia reserved all rights with respect to causes of action.

As to the first argument, this is likely a factual question which the Court cannot resolve

without hearing evidence.  A debtor must disclose all "known" causes of action on its schedules.

*In re Residential Capital, LLC*, 519 B.R. 890, 906 (Bankr. S.D.N.Y. 2014) (citing *In re Coastal

Plains*, 179 F.3d 197, 208 (5th Cir. 1999), for its test to determine when a debtor must disclose

potential causes of action pursuant to 11 U.S.C. § 521).  But a debtor does not need to disclose

"unknown" causes of action.  *Residential Capital*, 519 B.R. at 906.  If a debtor has enough

information before confirmation to suggest that it may have a cause of action against a party,

then it is a "known" cause of action that must be disclosed on its schedules for the benefit of

creditors.  *Id.*  Notwithstanding Solutia's argument that it did not know about the causes of

action, the Movants dedicate pages in their Reply to listing all the evidence that the Debtor knew

before filing its Plan about lawsuits that would implicate the SUAs.  (Reply ¶¶ 32–40.)  While it

is not certain from the record before the Court that the Debtor had sufficient information about

the causes of action to require disclosure, but it is also true that the Movant's argument may have

merit.

Solutia's second argument, that it reserved causes of action via its general reservation of

rights, is unavailing. "General retention clauses are not convenient hiding places for debtors . . .

. The creditors have a right to know what the debtor's assets are even though the potential may

be contingent, dependent, or conditional." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 56

(S.D.N.Y. 1999) (internal citation omitted), *amended*, 63 F. Supp. 2d 342 (S.D.N.Y. 1999).

Courts have generally required a sufficient level of specificity in order to retain a claim. For

example, in *MF Global*, the Court's conclusion that the claim at issue was sufficiently preserved

depended on multiple references to the specific contract at issue throughout the debtor's

bankruptcy filings. *See MF Glob. Holdings USA Inc. v. Heartland Co-Op (In re MF Glob.*

*Holdings Ltd.)*, No. 11-15059 (MG), 2017 WL 1373267 (Bankr. S.D.N.Y. Apr. 13, 2017). This

Court found the debtor's plan preserved derivative contract claims based on a combination of

factors, which included that (i) the specific derivatives contract in question was disclosed on the

debtors' schedules, *id.* at *2; (ii) the statement of financial affairs indicated the debtors were

reviewing the derivatives contracts to determine whether they might be assets or liabilities and

the debtors' reserved all their rights under them, *id.*; (iii) the plan and disclosure statement noted

the debtors' reserved rights to bring claims, *id*. at *2–3, and (iv) there were no allegations the

debtors deliberately concealed the asset from the court and creditors. *Id.* at *5. Here, Solutia has

not pointed to any specific references to the SUAs that would lead the Court to the conclusion

that the Debtor intended to preserve the causes of action. In sum, while Solutia may be able to

wordsmith the Plan into a colorable argument that they preserved causes of action, it is not the

case that the Movant's claim that the causes of action were not specifically preserved is totally without merit.

### 3.  Balance of All Factors

In sum, while the Movants have a colorable argument on the merits, the Movants have not provided a compelling reason why this Court is better suited to hear this dispute than the state or federal courts in Missouri.  The courts in Missouri have jurisdiction (the Missouri federal court may have jurisdiction, which is currently being challenged on a motion to remand).  Those courts have the ability to decide all bankruptcy defenses without having to reopen Solutia's bankruptcy case.  Accordingly, the Court declines to reopen the case.

## B.  Abstention Motion

While the Court has concluded that the Motion to Reopen should be denied, making it unnecessary to also address abstention, the Court will address Solutia's alternative request for relief, namely, abstention, for the sake of completeness.  As explained below, the Court concludes, in the exercise of discretion, that the Court should abstain from deciding whether Solutia is barred from seeking to enforce the SUAs.  Rather, a court in Missouri should be the one to decide the issues the Movants raise here.

The rationale for abstention is similar to the reasons for denying the Motion to Reopen.  The relevant factors favor abstaining.  Solutia has met its burden under 28 U.S.C. § 1334(c)(1).  In the *Old Carco* case, this Court articulated twelve factors courts should consider when deciding whether to abstain.  *In re Old Carco* LLC, 636 B.R. 347, 357–358 (Bankr. S.D.N.Y. 2022).  This Court need not analyze all twelve of the *Old Carco* factors.  *See id.* at 357 (invoking some, but not all, of the twelve factors to permissively abstain).  The *Old Carco* factors largely ask this Court to balance the federal interest in efficient bankruptcy administration against the interest of

comity between the state and federal courts.  *See Waleski v. Montgomery, McCracken, Walker & Rhoads, LLP (In re Tronox)*, 603 B.R. 712, 726 (Bankr. S.D.N.Y. 2019) (*citing Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 712–13 (S.D.N.Y. 2013)).  "Ultimately, the pursuit of 'equity,' justice,' and 'comity' involves a thoughtful, complex assessment of what makes good sense in the totality of the circumstances."  *Tronox*, 603 B.R. at 726.

Here, ten (10) of the twelve (12) *Old Carco* factors weigh in favor of abstention. Specifically, the First (the effect or lack thereof on the efficient administration of the estate), Second (the extent to which state law issues predominate over bankruptcy issues), Fourth (the presence of a related proceeding commenced in a nonbankruptcy court), Fifth (the jurisdictional basis, if any, other than 28 U.S.C. § 1334), Sixth (the degree of relatedness or remoteness of the proceeding to the main bankruptcy case), Seventh (the substance rather than the form of the asserted "core" proceeding), Ninth (the burden on the court's docket), Tenth (the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping), Eleventh (the right to a jury trial), and Twelfth (presence of non-debtor parties).  *In re Old Carco* LLC, 636 B.R. at 357–358.

First, as to efficiency, as noted with respect to the Motion to Reopen, having the Bankruptcy Court decide the case would not be efficient since it would not resolve all issues in the SUA Enforcement Action and would force the Debtor to incur costs without much benefit.

Second, the SUA Enforcement Action involves numerous state law issues amongst many non-debtor parties, certainly more than the limited issues the Movants present in the Proposed Motion to Enforce.  Therefore, the relief requested in the Missouri Complaint predominates over the bankruptcy-related issues presented by the Movants in the Proposed Motion to Enforce.

Third, whether and to what extent the Movants are liable under the contractual terms of the SUAs is largely a matter of Missouri contract law that should be heard by the Missouri Courts. *See In re Dana Corp.*, No. 06-10354, 2011 WL 6259640, at *4–*5 (Bankr. S.D.N.Y. Dec. 15, 2011) (permissively abstaining from interpreting sale order because essence of controversy was liability in state court breach of contract action). The Motion to Reopen is an attempt to defend against liability in two separate jurisdictions. Nothing prohibits the Movants from raising their bankruptcy-related arguments in the SUA Enforcement Action. Allowing the Movants to proceed with their proposed course of action would waste this Court's resources.

Fourth, the SUA Enforcement Action is a related proceeding that can resolve all disputes between the relevant parties (most of which are non-debtors) arising from or related to the SUAs. This related proceeding will determine the rights and obligations of the parties under the SUAs. The limited relief requested by the Movants thus overlaps with the SUA Enforcement Action in the Missouri Courts. *See, e.g., In re Palumbo*, 556 B.R. 546, 554 (Bankr. W.D.N.Y. 2016) (permissively abstaining under Fourth, Sixth, Tenth, and Twelfth *Old Carco* factors).

Fifth, no other jurisdictional ground exists for this Court to hear the Movants' relief requested other than 28 U.S.C. § 1334—that is, the SUA Enforcement Action neither arises under federal law nor constitutes diversity jurisdiction between the Missouri Plaintiffs and defendants. Thus, the lack of jurisdictional grounds other than 28 U.S.C. § 1334 and the pendency of the SUA Enforcement Action tips in favor of abstention.

Sixth, the SUA Enforcement Action is remote from the bankruptcy proceeding which weighs towards abstention. In *Old Carco*, this Court held that an MDL proceeding occurring ten (10) years after a bankruptcy case was filed was too remote to have a conceivable effect on the bankruptcy case. 636 B.R. at 360. Accordingly, this Court permissively abstained in that

45

instance and applies the same reasoning here, finding that the remoteness of the SUA

Enforcement Action to this Bankruptcy Case weighs in favor of abstention.  *See id.*  Further,

because these tort claims were always going to be litigated in state court it is not clear how the

enforcement of SUAs for state law claims that rode through the bankruptcy would affect the

bankruptcy estate.

Seventh, as a matter of substance over form, the Movants ultimately desire that this Court

analyze the SUAs under state law, not the Plan.  Specifically, the Movants seek to lead this Court

to believe that the main dispute between the parties is Plan language, but the Missouri Complaint

and the Proposed Motion to Enforce demonstrate that the main dispute is whether the Movants

are liable under the SUAs.  Thus, the substance of this proceeding is not related to interpreting

the Plan.  Accordingly, the seventh factor also supports abstention.

Ninth, abstaining in this instance would promote judicial economy.  The Missouri Courts

will be making numerous rulings on the SUAs, analyzing the SUAs in detail.  The Movants

ultimately desire this Court to serve as a "gatekeeper" on all bankruptcy-related disputes arising

from or related to the SUAs, but that reasoning is misplaced.  The Missouri Courts neither

require nor requested "guideposts" from this Court to determine (1) whether the SUAs are

executory, and (2) whether Reorganized Solutia should be judicially estopped from asserting

causes of action in the SUA Enforcement Action.  Thus, judicial economy weighs heavily in

favor of abstention.

Tenth, given that the Missouri Courts could resolve all the issues, Solutia reasonably

argues that the Movants may be forum shopping.  This Bankruptcy Case is akin to *Old Carco*

where this Court abstained due, in part, to forum shopping by the party seeking relief from this

Court.  *See id.*  Furthermore, the Movants' forum shopping is particularly salient given the fact

that the Proposed Motion to Enforce will not fully resolve the SUA Enforcement Action.  Forum shopping weighs towards abstention.  *See id.*

Eleventh, Reorganized Solutia has requested a jury trial in the SUA Enforcement Action. If this Court acts as a bankruptcy "gatekeeper" on the Movants' bankruptcy-related defenses, this Court would, in effect, curtail or deprive Reorganized Solutia of its constitutional right to have a jury serve as factfinder.  Thus, Reorganized Solutia's right to a jury trial weighs in favor of abstention.

Twelfth, the dispute involves many non-debtor parties, such as Old Monsanto, New Monsanto, and the Movants.  The presence of these non-debtor parties greatly outweighs the presence of Reorganized Solutia.  Reorganized Solutia is merely one party in the multi-party dispute relating to the SUAs.  The overwhelming presence of non-debtor parties favors abstention.  Accordingly, this Court defers to the Missouri Courts that has jurisdiction over all of the parties to this dispute.

## VI.    CONCLUSION

For the reasons discussed herein, the Motion to Reopen is **DENIED**.  Alternatively, the Motion to Abstain is **GRANTED**.

**IT IS SO ORDERED.**

Dated:    August 23, 2023
          New York, New York

*Martin Glenn*
MARTIN GLENN
Chief United States Bankruptcy Judge